| | | |
|---|---|---|
| **BILLY MILLER d/b/a PINEY WOODS** | ) | |
| **LUMBER CO.,** | ) | |
| | ) | |
| **Plaintiff, Counter-Defendant, and** | ) | |
| **Third-Party Plaintiff,** | ) | |
| | ) | **Case No. 3:10-cv-0819** |
| **v.** | ) | **Judge Trauger** |
| | ) | |
| **DAIRYMAN'S SUPPLY CO., INC.,** | ) | |
| | ) | |
| **Defendant and Counter-Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **RANDY DRIVER, and WILLIAM CARTER &** | ) | |
| **DALE HIX, Individually and d/b/a** | ) | |
| **PERFORMANCE AUTO SALES,** | ) | |
| | ) | |
| **Third-Party Defendants.** | ) | |

### MEMORANDUM

Pending before the court are a set of related Motions for Summary Judgment. Plaintiff, Counter-Defendant, and Third-Party Plaintiff Billy Miller d/b/a Piney Woods Lumber Company ("Miller") has filed a Motion for Summary Judgment against defendant and counter-plaintiff Dairyman's Supply Company, Inc. ("Dairyman's") (Docket No. 77), to which Dairyman's has filed a Response in opposition (Docket No. 96), and Miller has filed a Reply (Docket No. 98). Dairyman's has filed a Motion for Summary Judgment against Miller (Docket No. 52), to which Miller filed a Response in opposition (Docket No. 67), and third-party defendants William Carter and Dale Hix, individually and d/b/a Performance Auto Sales (collectively, "Carter &

Hix"),[1] also filed a Response in opposition (Docket No. 64), and Dairyman's filed a Reply to Miller's Response (Docket No. 82) and a Reply to Carter & Hix's Response (Docket No. 80), in which Dairyman's requests that the court strike the Carter & Hix Response. Carter & Hix have also filed a Motion for Summary Judgment against Miller (Docket No. 74), to which Miller filed a Response in opposition (Docket No. 86), and Carter & Hix filed a Reply (Docket No. 99).

## BACKGROUND[2]

This case concerns a series of transactions between and among Miller, Dairyman's, Driver, and Carter & Hix relating to the sale of lumber. The court has analyzed the parties' various submissions in considering the pending motions.[3]

---

[1]Third-party defendants Carter & Hix are represented by the same counsel. Third-party defendant Driver is proceeding *pro se*.

[2]The manner in which the parties have presented their statements of material fact has led to some confusion concerning which facts are disputed. In some instances, Party X "admits" a fact relative to Party Y in the context of one Motion for Summary Judgment, while Party Z denies that same fact relative to Party Y in the context of a separate Motion for Summary Judgment. (*Compare, e.g.*, Docket No. 66, Carter & Hix's Response to Dairyman's Fact No. 25) ("admitting" Dairyman's representation that the 28 loads outstanding on April 1, 2010 were covered by two particular contracts; *with* Docket No. 68, Miller's Response to Dairyman's Fact No. 25 ("disputing" Dairyman's representation to that effect and contending that three of the outstanding loads were actually covered by a third contract). Where these discrepancies have occurred and are relevant, the court has endeavored to resolve, by reference to the evidentiary record, whether the facts are actually subject to a genuine dispute.

[3]The parties filed a substantial volume of material with respect to each of the Motions for Summary Judgment.

In support of Dairyman's Motion for Summary Judgment (Docket No. 52), Dairyman's filled (a) a Memorandum of Law (Docket No. 53), (b) a Statement of Undisputed Material Facts ("SUMF") with attached exhibits (Docket No. 54), (c) the transcript of the deposition of Billy Miller (Docket No. 50), and (d) the Affidavit of Greg Cook, Dairyman's Vice President (Docket No. 51). In response to Dairyman's motion, (1) Miller filed (a) a Response in opposition (Docket No. 67), (b) a Memorandum of Law (Docket No. 70), a Response to Dairyman's SUMF (Docket No. 68), (c) a separate Statement of Additional Material Facts ("Miller's SAMF"), (d) the transcript of the deposition of James Gargus, (e) Dairyman's purchasing agent (Docket No. 71), and (f) the transcript of the deposition of Greg Cook (Docket No. 72); and (2) Carter & Hix

# I.    **The Parties**

The parties to this case have each, over time, engaged in the business of purchasing and

reselling lumber.  Driver and Hix went to middle school together and remained in contact in a

business capacity.  Hix ran Performance Auto Sales ("Performance Auto"), a family business

that engaged in, *inter alia*, the purchase and resale of lumber.  Carter and Hix joined in certain

business ventures, including, in relevant part, the purchase of a warehouse facility in Lafayette,

---

filed (a) a Response in Opposition (Docket No. 64), (b) a Response to Dairyman's SUMF with
attached exhibits and an accompanying Statement of Additional Facts ("Carter & Hix's SAMF")
(Docket No. 66), including the Affidavit of Dale Hix (Docket No. 66, Ex. B), (c) a Memorandum
of Law (Docket No. 65); (d) the transcript of the deposition of James Gargus (Docket No. 62),
and (e) an Affidavit of Dale Hix (Docket No. 63).  In reply thereto, Dairyman's filed (a) a Reply
to Miller's Response (Docket No 84), (b) a Reply to Miller's SAMF (Docket No. 85), (c) a
Reply to Carter & Hix's Response (Docket No. 80), and (d) a Reply to Carter & Hix's SAMF
(Docket No. 81).  Dairyman's has moved to strike Carter & Hix's opposition papers on the
grounds that Carter & Hix are not adverse to Dairyman's and, therefore, cannot oppose the
motion pursuant to Rule 56.  The court denies that request, because, under the particular
circumstances presented here, Carter and Hix's interests are certainly affected by the court's
disposition of Dairyman's motion.  In any case, the court's findings concerning Dairyman's
motion would be the same, whether or not Carter & Hix's response papers are considered.

In support of Carter & Hix's Motion for Summary Judgment against Miller (Docket No.
74), Carter & Hix filed (a) a Memorandum of Law (Docket No. 75), (b) a Statement of
Undisputed Material Facts ("Carter & Hix's SUMF") (Docket No. 76), which included the
Affidavit of William Carter (*id.*, Ex. A. (exhibits thereto at Attachment Nos. 2 and 3)), and (c)
the Affidavit of William Carter (Docket No. 73).  In response, Miller filed (a) a Response in
opposition (Docket No. 86), (b) a Memorandum of Law (Docket No. 89), (c) a Response to
Carter & Hix's SUMF (Docket No. 87), (d) a Statement of Undisputed Material Facts ("Miller's
SAMF") (Docket No. 88), (e) the transcript of the deposition of Dale Hix (Docket No. 90), (f)
the transcript of the deposition of Randy Driver (Docket No. 91), (g) the Affidavit of Billy Miller
(Docket No. 93), and (h) certain of Carter & Hix's discovery responses (Docket Nos. 94 and 95).
In reply thereto, Carter & Hix filed a Reply brief (Docket No. 99) and a Reply to Miller's SAMF
(Docket No. 100).

In support of his Motion for Summary Judgment against Dairyman's (Docket No. 77),
Miller filed a Memorandum of Law (Docket No. 78) and a Statement of Undisputed Material
Facts ("Miller's SUMF") (Docket No. 79).  In response to Miller's motion, Dairyman's filed a
Response in opposition (Docket No. 96) and a Response to Miller's SUMF (Docket No. 97).  In
reply thereto, Miller filed a Reply brief (Docket No. 98).

Tennessee and the purchase of large quantities of lumber stored at that facility pending resale.[4]

Miller and Driver worked for businesses engaged in the marketing of lumber, and Miller

operated a sole proprietorship called "Piney Woods Lumber Company" ("Piney Woods").

Dairyman's engaged in, *inter alia*, the purchasing and reselling of various buildings products,

including lumber.

This case concerns two sets of transactions: (1) multiple early 2010 transactions

involving Miller, Driver, Dairyman's, and Carter & Hix relating to the purchase and sale of

lumber stored at Carter & Hix's warehouse in Lafayette, Tennessee (collectively, "Lafayette

Transactions"); and (2) a 2010 transaction between Miller and Dairyman's relating to lumber

stored at a facility in McMinville, Tennessee ("McMinville Transaction").

## II.     Background to the First Lafayette Transaction

At some point in 2007, during the real estate boom, Hix and Carter became interested in

investing in "Oriented Strand Board" lumber ("OSB") for resale, including purchasing the

lumber from a bulk supplier and purchasing or leasing warehouse space to store the lumber.  Hix

contacted Driver for assistance in locating a seller of OSB; Driver in turn contacted Miller for

assistance in locating a seller.  Accordingly, Miller brokered an April 2007 sale of OSB from a

third party supplier to Performance Auto, from which Miller derived a commission based on the

total sale price.  Around the same time, Hix & Carter purchased a large warehouse, in a portion

of which they ultimately stored the lumber.

Between April 2007 and February 2010, Hix & Carter (d/b/a Performance Auto Sales)

---

[4]In the pending motions, the parties have essentially treat the interests of Carter, Hix, and
Performance Auto interchangeably.

sold 10 loads of OSB to Piney Woods. These sales reflected only a fraction of the OSB being stored at the Lafayette warehouse, which Carter & Hix apparently were having a difficult time selling after the real estate market crashed.

In early 2010, prices for OSB began to rise again, at which point Hix and Driver discussed the possibility of selling off Hix & Carter's remaining OSB. Hix & Carter appear to have been aware that, prior to purchasing any OSB, Driver would need to identify a downstream purchaser to whom Driver would sell the lumber upon purchase from OSB. For assistance, Driver contacted Miller, and the two agreed to split the profits from any transactions "50/50."

At some point in or about February 2010, Driver determined that Dairyman's required 20 loads of OSB to sell to its customers. Driver directed Miller to contact Carter & Hix to determine whether they would sell 20 loads of lumber and at what price. Driver separately determined that Dairyman's would purchase the lumber for $203 per thousand square feet (a typical commercial unit), at which point he asked Miller to handle the transactions with Carter & Hix and with Dairyman's, including the associated paperwork.

Verbally, Carter & Hix agreed to sell the loads to Miller for $195 per thousand square feet. Separately, Miller, doing business as Piney Woods, entered into a written contract with Dairyman's to sell the 20 loads of lumber to Dairyman's for $203 per thousand square feet. The contract, dated February 10, 2010, contains "Piney Woods" letterhead, is signed by a Dairyman's representative with appropriate authority (Purchasing Agent James Gargus), and reads as follows:

> Dairyman's Supply Co., Inc. has agreed to purchase 20 truck loads of 7/16 OSB from Piney Woods Lumber Co. at a cost of $203.00 per thousand square feet. A full truckload will consist of 960 pieces or 30,720 square feet at a total cost of $6,236.16 [interlineation] per truck load.

5

> Payment is to be made within ten (10) days) after picked up at 608 Oak Street Lafayette, Tn [*i.e.*, Carter & Hix's warehouse]. All 20 trucks are to be picked up within 4 weeks. Each truck will be assigned a P.O. number.
>
> Piney Woods Lumber Co. will send proof of delivery and invoices by mail weekly.
>
> Delivery to start the week of [handwritten] Feb 15, 2010.

(Docket No. 54, Ex. B ("2/10/10 Miller-Dairyman's Contract")) As the contract indicates, it did not identify a specific delivery date – instead, it defined the delivery as "within 4 weeks," but left it ambiguous whether the "4 weeks" period would begin on February 10, 2010 (the date the contract was signed) or February 15, 2010 (the date the first pickup could be made). At any rate, as structured, Miller (and Driver pursuant to their 50/50 split) stood to make a profit on each load of lumber, reflecting the difference between the $195 per unit price at which Carter & Hix agreed to sell Miller the lumber and the $203 per unit price at which Dairyman's had agreed to purchase the lumber from Miller.

In a separate contractual arrangement, Dairyman's agreed to sell the 20 loads of lumber to its customer, Viking Forest Products, LLC ("Viking"), at a unit rate higher than the unit rate it had negotiated with Miller – *i.e.*, Dairyman's stood to profit by purchasing the lumber from Miller for $203 per load and reselling the lumber at a markup to Viking Under the agreement between Dairyman's and Viking, Viking agreed to arrange pick up of the lumber loads at Hix & Carter's warehouse in Lafayette and apparently hired a third-party trucking company for that purpose. Viking and Dairyman's established purchase order numbers corresponding to each truck, Dairyman's provided those purchase numbers to Miller, and Miller in turn furnished those purchase order numbers to Hix & Carter. When each truck reached the warehouse, Carter & Hix would verify the purchase order number corresponding to that load, the driver would sign the

purchase order to confirm pickup, and the driver would leave the warehouse with the load. Upon

pickup, Carter & Hix would submit an invoice containing the sale price for that load to Miller.

Pursuant to his separate agreement with Dairyman's, Miller would then invoice Dairyman's for

that particular load at the markup rate he had separately negotiated with Dairyman's.

Dairyman's would then remit payment to Miller, at which point Miller would pay Carter & Hix's

original invoice for that load, retaining the balance as profit and splitting that balance with

Driver.[5]

With respect to the February 10, 2010 transaction, 16 out of the 20 loads were picked up

by March 15, 2010 – 30 days after the first "delivery date" specified in the February 10, 2010

Contract. Viking picked up the remaining four loads within 10 days thereafter. (*See* Docket No.

50, Ex. 1, Miller Dep. at 54:9-18.)

### III.   Second Set of Lafayette Transactions

Shortly after negotiating the first set of Lafayette Transactions, Miller negotiated a

second set of agreements to purchase and sell lumber stored at Carter & Hix's Lafayette

warehouse. On or before February 18, 2010 – still within the delivery/pickup period in the

---

[5]With respect to the Lafayette Transactions collectively, Dairyman's appears to have contracted with Viking and, at least as to contracts signed on March 12, 2010 (discussed below), a second customer, Tampa International. In each of these transactions, Dairyman's agreed to sell its customer lumber at a markup from its rate to purchase the lumber from Miller. The customer would then make its own arrangements to pick up the lumber, typically by hiring third-party trucking companies to make the pickups.

Accordingly, with respect to the Lafayette transactions, Carter & Hix agreed to sell the lumber to Miller for rate X, Miller agreed to sell the lumber to Dairyman's at rate X + Y (earning himself and Driver a profit of "Y" per load), and Dairyman's agreed to sell the lumber to its customer(s) at a rate of X + Y + Z (earning itself a profit of "Z"). Until pickup by Viking or Tampa's hauler, the lumber at all times remained at Carter & Hix's Lafayette warehouse.

2/10/10 Miller-Dairyman's contract – Dairyman's made Miller aware that Dairyman's required another 35 truck loads of OSB. Miller accordingly contacted Carter & Hix to determine whether Carter & Hix would sell the loads and at what price.[6] Miller determined that Carter & Hix would sell the lumber for $198 per unit. Miller called Dairyman's and determined that Dairyman's would purchase the lumber from him for $208 per unit.

Utilizing essentially the same form contract as before, on February 18, 2010, Miller (d/b/a Piney Woods) and Dairyman's entered into a contract (Docket No. 54, Ex. B ("2/18/10 Miller-Dairyman's Contract")), which specified that Dairyman's would purchase 35 truck loads of lumber from Piney Woods for $208 per thousand square feet, "[a]ll trucks to be picked up within 4 weeks," "[d]elivery to start the week of February 22, 2010." Again, based on the language of this contract, it was unclear whether the "4 weeks" began to run on the date the contract was signed or the first delivery date.

At any rate, with respect to the loads subject to the second set of Lafayette Transactions, Miller, Carter & Hix, and Dairyman's handled pickups, invoicing, and payment streams in essentially the same manner as before. However, as of March 22, 2010 – 30 days from the first available pickup date – Dairyman's customer(s) had picked up only 26 of the 35 loads. Dairyman's customer picked up four of the remaining 9 loads shortly thereafter, but Dairyman's permanently denied access to the remaining five loads. Carter & Hix paid Miller for the 30 loads that were picked up, but not the five loads to which they had denied access.[7]

---

[6]It appears that Driver had limited, if any, involvement after the first set of Lafayette Transactions, aside from collecting payment checks that Miller periodically issued to him.

[7]It is not clear why or when Carter & Hix refused to allow access to these five loads. Depending on the proof at trial, the jury may need to consider the circumstances relating to these

## IV.     Carter & Hix Complaints and the Third and Fourth Sets of Lafayette Transactions

At some point in March 2010, Carter & Hix complained to Miller about the delays in pickups of the loads they had agreed to sell to Miller.  Miller relayed these concerns to representatives at Dairyman's, who acknowledged the issue.[8]

On or about March 12, 2010, Dairyman's informed Miller that it required additional lumber.  It appears that Dairyman's contacted Miller to arrange to purchase 7 loads of lumber and, later that day, contacted Miller again to arrange the purchase of 25 additional loads of lumber.[9]  Accordingly, Miller arranged two additional purchase and resale transactions.  Miller contacted Carter & Hix, who indicated, in relevant part, that they would agree to sell the loads of lumber, but only on the condition that the lumber be picked up by April 1, 2010.

Miller contacted Dairyman's and entered into two agreements with Dairyman's on March 12, 2010, which contained different terms from those expressed in the initial two contracts.  The first March 12, 2010 contract between Miller d/b/a Piney Woods and Dairyman's ("First 3/12/10 Miller-Dairyman's Contract") reads, in relevant part, as follows:

> Dairyman's Supply Co., Inc., has agreed to purchase (7) trucks loads of 7/16 OSB from Piney Woods Lumber Co. at a cost of $206.00 per thousand square feet . . . .

loads separately from the circumstances relating to other loads in dispute.

[8]As Hix testified: "For a few days they [the trucks] would pick up six or seven loads a day.  Then toward the end they were picking up one load.  And I was working somewhere else.  Mr. Miller would call me, I would quit doing that [*i.e.*, working at another location], get in my truck, drive over and get this."  (Hix Dep. at 78:21-79:5.)  "I didn't want to be loading a day, two days a week for the rest of the year.  We wanted it gone, wanted our money, and wanted to be through with it."  (*Id.* 77:20-78:1.)

[9]Although it is not clear from the record why Dairyman's negotiated two separate deals (each at a different unit rate), it may be that Dairyman's arranged one transaction to sell a certain number of loads to Viking and the other to sell a different number of loads to Tampa.

*All (7) trucks are to be picked up by 4/1/10[.] . . .*

Delivery to start the week of 3/15/10.

(Docket No. 54, Ex. C) (emphasis added). Similarly, on the same day, Miller d/b/a Piney Woods entered into a second, separate contract with Dairyman's ("Second 3/12/10 Miller-Dairyman's Contract"). In relevant part, that contract reads as follows:

> Dairyman's Supply Co., Inc. has agreed to purchase (25) truck loads of 7/16 OSB from Piney Woods Lumber Co. at a cost of $204.00 per thousand square feet . . .
>
> *All (25) trucks are to be picked up by 4/1/10 . . . .*
>
> Delivery to start the week of 3/15/10.

(Docket No. 54, Ex. D (emphasis added).) As before, Miller entered into separate verbal agreements with Carter & Hix to purchase these loads (at rates lower than $206 per unit and $204 per unit, respectively), provided that all loads would be picked up by April 1, 2010.

Unlike their 2/10/10 and 2/18/10 contracts, the First and Second 3/12/10 Miller-Lafayette Contracts specified a final delivery date: April 1, 2010.

## V.   Complications Concerning Pickups and Disputed Facts

Miller advised Dairyman's that Carter & Hix needed to complete the lumber deliveries by April 1, 2010, the day before Carter & Hix were scheduled to take a vacation. However, by the morning of April 1, 2010, only a handful of the 32 loads covered by the 3/12/10 Contracts I and II had been picked up.[10] On or about April 1, 2010, Miller contacted Carter & Hix to seek

---

[10]The parties do not appear to agree about the composition of these 28 loads relative to each of the four contracts. Dairyman's and Carter & Hix assert that the 28 loads reflect only loads subject to the 3/12/10 Contracts I and II; by contrast, Miller asserts that only 23 of the 28 loads were subject to the 3/12/10 Contracts I and II, while the remaining 5 loads were subject to the 2/18/10 Contract. Although the court's disposition of the pending motions does not turn on this distinction, the parties should reach agreement on this apparent dispute in advance of trial.

an extension of time for delivery of 28 loads of lumber,[11] at least 23 of which were subject to the 3/12/10 Contracts I and II.  The parties appear to dispute whether, as of April 1, 2010 (or even a day or two earlier than that), it had become physically or practically impossible to pick up the remaining loads.

The parties vigorously dispute what happened next.  According to Miller, on the morning of April 1, 2010, Carter & Hix told him that, although they were going to be away for approximately two weeks and could not make deliveries during that time, Miller's purchaser could arrange for pickup of the remaining loads beginning April 14, 2010, notwithstanding the previously agreed-upon final delivery/pickup date of April 1, 2010.  Although Carter & Hix acknowledge that they spoke with Miller on or about that date, they deny that they ever agreed to permit any pickups after April 1, 2010.

After his conversation with Carter & Hix, Miller informed Dairyman's that he and Carter & Hix had agreed to an extension of time to complete the pickups.  Miller did not declare Dairyman's to have breached any of the Miller-Dairyman's Agreements, including their promises to complete pickups by April 1, 2010.  After Miller informed Dairyman's of the (alleged) extension, neither Miller nor Dairyman's undertook any efforts to arrange pickups on April 1, 2010.  Similarly, between April 1 and April 14, 2010, neither Miller nor Dairyman's undertook any efforts to procure replacement lumber, apparently assuming that lumber would be available for pickup at the Lafayette warehouse when Carter & Hix returned from vacation.

---

[11]Dairyman's representative James Gargus was unsure when he first heard from Miller about a potential extension, believing it to have been perhaps within a day or two of April 1, 2010.  Miller testified that the conversation took place on April 1, 2010 and produced phone records showing that he had discussions with Carter and/or Hix on that date.

On or about April 14, 2010, after Carter & Hix had returned from vacation, Dairyman's customer sent trucks to the warehouse to begin picking up the remaining loads. However, at the warehouse, Carter & Hix refused to permit the trucks to load the lumber. After learning of this issue, Miller pleaded with Carter & Hix to permit the deliveries to proceed, but Carter & Hix refused to do so. Miller contends that Carter & Hix informed him that they had "changed their minds" about granting access after the original April 1, 2010 cutoff date. Miller suggests that Carter & Hix did so because the price of OSB was rising dramatically and Carter & Hix stood to make more money by selling off the OSB to third parties at rates that were significantly higher than the contractual rates that Carter & Hix had previously negotiated with Miller.[12]

Dairyman's customers still required the promised loads of lumber. To cover for Carter & Hix's refusal to permit pickup of the loads in Lafayette, Dairyman's permitted its customers to purchase replacement lumber, for which Dairyman's reimbursed them in full. Unfortunately, the price of lumber had skyrocketed subsequent to Dairyman's original arrangement with Miller. Thus, in reimbursing its customers for the "cover" lumber, Dairyman's paid significantly more to its customers than it would have paid to Miller for those loads, had Carter & Hix not denied

---

[12]Record evidence indicates that Carter & Hix sold significant quantities of OSB to multiple third parties both before and shortly after April 14, 2010. Miller avers that, in so doing, Carter & Hix may have made approximately $85,000 more than they would have made if they had completed the sales to Miller at the previously negotiated rates. Miller has produced statistics from an industry journal purporting to show that prices for OSB rose steadily and dramatically between January 2010 and mid-May 2010. For example, according to Miller's chart (Docket No. 93), the wholesale unit price from $167 per unit on January 8, 2010 to $350 per unit on May 14, 2010. More specifically, between March 26, 2010 and April 16, 2010 (roughly corresponding to the final delivery date and the date on which Carter & Hix allegedly "changed their minds"), the wholesale unit price rose from $233 on March 26, 2010 to $325 on April 16, 2010 – a nearly 40% increase.

access.[13]

In sum, Miller was involved in four transactions related to lumber pickups at Carter & Hix's Lafayette Warehouse, which the court will refer to hereafter as the "Lafayette Transactions."

## VI. The McMinville Transaction and the Parties' Respective Claims

In a separate transaction not involving Carter & Hix's lumber, Dairyman's agreed to purchase 32 loads of lumber from Miller/Piney Woods, to be picked up at a facility in McMinville, Tennessee (*i.e.*, the McMinville Transactions). Specifically, Miller and Dairyman's entered into a contract on March 24, 2010, whereby Miller agreed to sell and Dairyman's agreed to purchase 32 truck loads of OSB from Miller.[14] Dairyman's timely picked up the loads by mid-April 2010. However, Dairyman's only paid Miller for 12 loads and refused to pay Miller the remaining balance of approximately $141,277.52, which Dairyman's claimed as on offset against the losses it had incurred in connection with the Lafayette Transactions.

Based on the interplay between the McMinville Transaction and the Lafayette Transactions, the parties assert competing claims, as follows:

- Miller's Claims Against Dairyman's: Miller asserts a breach of contract claim against Dairyman's, alleging that Dairyman's owes him the $141,277.52 balance on the McMinville Transaction, along with

---

[13]Miller and Carter & Hix have identified potentially legitimate concerns with the manner in which Dairyman's sought to mitigate its alleged damages and whether the customers' pricing of the replacement lumber was reasonable. The court need not resolve those concerns at this stage.

[14]Miller's Complaint also referenced a second transaction, in which Dairyman's verbally agreed to purchase two loads from Miller for pickup at the McMinville facility. However, in briefing Miller's motion, Miller and Dairyman's refer only to the 32 loads subject to the March 24, 2010 written agreement.

reasonable attorney's fees, costs, and incidental and consequential damages.

- Dairyman's Counter-Claims Against Miller: In response, Dairyman's asserts counter-claims against Miller relating to the Lafayette transactions, including breach of contract and violations of the Tennessee Consumer Protect Act ("TCPA"), for which it seeks compensatory damages, treble damages, attorney's fees, prejudgment interest, and costs.

- Miller's Third-Party Claims Against Driver and Carter & Hix: In response to Dairyman's counter-claims, Miller asserts third-party claims against Driver and Carter & Hix related to the Lafayette Transactions, alleging that (a) Miller and Driver entered into a joint venture in the Lafayette Transactions and, therefore, that Driver must share half the cost of any judgment against Miller in this case, and (b) Carter & Hix are liable to Miller under theories of breach of contract, promissory estoppel/detrimental reliance, and breach of implied contract/unjust enrichment, for which Miller seeks indemnification against Dairyman's claims, prejudgment and postjudgment interest, costs, and attorney's fees.

Miller has moved for summary judgment against Dairyman's, demanding (1) dismissal of Dairyman's counter-claims and (2) judgment in his favor.[15] Dairyman's has also moved for summary judgment, demanding (1) dismissal of Miller's claims against it, and (2) summary judgment in its favor on its counter-claims against Miller. Carter & Hix have also moved for summary judgment, demanding dismissal of Miller's claims against them.[16]

_____

[15]Miller has not moved for summary judgment on his third-party claims against Driver. Therefore, the court interprets Miller's demand for judgment as relating only to the claim against Dairyman's asserted in his original Complaint – *i.e.*, the claim against Dairyman's relating to the McMinville Transaction. Furthermore, because Miller has not sought summary judgment on his third-party claims against Driver, Miller's Motion for Summary Judgment is, in fact, a Motion for Partial Summary Judgment. Miller should have filed a separate motion for leave of court to so file, pursuant to the Case Management Order (Docket No. 35 ¶ 6). Notwithstanding this oversight, the court will consider Miller's motion.

[16]Third-party defendant Randy Driver, who is proceeding *pro se*, has not moved for summary judgment, nor has Miller moved for summary judgment on his joint venture claim against Driver.

## SUMMARY JUDGMENT STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (2011). At the summary judgment stage, the moving party bears the initial burden of identifying those parts of the record that demonstrate the absence of any genuine issue of material fact. *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). However, if the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial, the moving party may meet its burden by showing that there is an absence of evidence to support the non-moving party's case. *Id.* (citing *Celotex*, 477 U.S. at 325). "When the moving party has carried this burden, 'its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).) The non-moving party also may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial. *Id.*

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Moldowan*, 578 F.3d at 374 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the nonmoving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita*, 475 U.S. at 587). But "[t]he mere existence of a scintilla of evidence in support of the non-moving

party's position will be insufficient," *Moldowan*, 578 F.3d at 374 (quoting *Anderson*, 477 U.S. at 252), and the non-movant's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249. An issue of fact is "genuine" only if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Matsushita*, 475 U.S. at 587).

## ANALYSIS

### I. Applicability and Application of the UCC to the Lafayette Transactions

Tennessee has adopted the Uniform Commercial Code ("UCC") within Tenn. Code Ann. § 47-1-101 *et seq*. (2012). As a general matter, "[u]nless displaced by the particular provisions of [the UCC], the principles of law and equity, including . . . estoppel, fraud, misrepresentation, . . . mistake, . . . and other validating or invalidating cause supplement its provisions." *Id.* § 47-1-103.

#### A. Applicability of the Statute of Frauds

The UCC includes a Statute of Frauds section, Tenn. Code § 47-2-201, which governs contracts for the sale of goods for a price of $500 or more. Here, the contracts that Miller entered into with Carter & Hix and with Dairyman's each concerned contractual amounts for the sale of goods (lumber) at prices well over $500. Therefore, all of the contracts subject to the Lafayette Transactions are subject to the UCC's Statute of Frauds.

The Statute of Frauds provides that a contract for the sale of goods is not enforceable, by way of action or defense, absent a sufficient writing signed by the party against whom enforcement is sought, except in certain enumerated circumstances. Tenn. Code Ann. § 47-2-201. Here, the four written agreements between Miller and Dairyman's, which Dairyman's

signed, plainly satisfy the writing requirement of § 47-2-201(1).

As to the verbal agreements between Miller and Carter & Hix, although the agreements were not memorialized in a contemporaneous writing signed by Carter & Hix, those agreements are nevertheless enforceable under at least one exception to the Statute of Frauds writing requirement of subsection (1). Subsection (3) of § 47-2-201 provides that a contract is enforceable if . . . "the party against whom enforcement is sought admits in . . . testimony . . . that a contract for sale was made . . . ." *Id.* § 47-2-201(3). Here, Hix admitted at deposition that he and Carter entered into the agreements with Miller for the purchase and sale of the OSB that is the subject of this dispute.[17] Therefore, the original agreements between Miller and Carter & Hix constituted enforceable contracts in compliance with the Statute of Frauds. Indeed, the conduct of Carter & Hix and Miller clearly reflects the existence of these agreements. *See id.* § 47-2-204 ("A contract for sale of goods may be made in any manner sufficient to show agreement, including offer and acceptance, [and ] conduct by both parties which recognizes the existence of

_____

[17]Carter & Hix's position that the verbal agreements are not enforceable is disingenuous in light of Hix's unambiguous testimony. For example:

> Q: Wasn't there an agreement to sell this OSB, this last series of truckloads of lumber, these 28 that weren't picked up, there was an agreement to sell that to Mr. Miller or to Dairyman's or to whoever. There was an agreement to sell it, it's just they didn't comply with the agreement by picking it up by April the 1st. Isn't that what you're saying?
>
> A: Yes.

(Docket No. 90, Ex. 1, Hix Dep. at 100:7-15; *see also id.* at 78:16, 81:6-9, 96:16-20.) Tellingly, Carter & Hix do not even address the applicability of § 47-2-201(3)'s exception to the writing requirement.

a contract[.]"[18]

## B.   The Contractual Terms

The parties also dispute whether Miller acted as a "broker" in the Lafayette Transactions. The record conclusively establishes that Miller acted as a buyer with respect to Carter & Hix and as a seller with respect to Dairyman's, *not* as a "broker" between Carter & Hix and Dairyman's. The factual and legal arguments establishing that Miller was not a broker are accurately addressed in Carter & Hix's Memorandum of Law in support of their Motion for Summary Judgment.  (*See* Docket No. 75 at pp. 3-9.)[19]

The parties also disagree as to whether the April 1, 2010 delivery date in the First and

---

[18]Although the court need not reach the issue, the contracts may also be enforceable under subsection (2) of the of Statute of Frauds, which provides that, "[b]etween merchants if within a reasonable time a writing or record in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within ten (10) days after it is received."  Tenn. Code. Ann. § 47-2-201(3).  Here, shortly after reaching each agreement with Carter & Hix, Miller faxed purchase orders and/or bills of lading reflecting the agreed-upon purchase price and quantity subject to each agreement, to which Carter & Hix did not voice any objection within 10 days.  Carter & Hix may qualify as "merchants," as defined by UCC § 47-2-104.  *See Brooks Cotton Co., Inc. v. Williams*, No. W2011-01415-COA-R9-CV, 2012 WL 1392370, at *7 (Tenn. Ct. App. Apr. 23, 2012) (stating that "the definition of merchant for purposes of the Statute of Frauds encompasses 'almost every person in business'") (quoting Tenn. Code Ann. § 47-2-104, cmt. 2).

[19] Briefly: neither Carter & Hix nor Dairyman's delegated Miller to act on its behalf; Miller held himself out and entered into business as an independent business (typically as "Piney Woods"); Miller represented to Carter & Hix that he (Miller/Piney Woods) was purchasing lumber from them and represented to Dairyman's that he (Miller/Piney Woods) was selling lumber to them; Carter & Hix could not control the rate at which Miller sold lumber to Dairyman's, nor could Dairyman's control the rate at which Miller purchased lumber from Carter & Hix; Miller signed and filed with the Tennessee Department of Revenue a blanket certificate of resale that permitted him to avoid paying sales tax on OSB he purchased from Performance Auto (*i.e.*, Carter & Hix), which would have been unnecessary under a brokerage relationship; and the written agreements, invoices, and bills of lading indicate that Miller/Piney Woods (not Carter & Hix) sold OSB to Dairyman's, indicating that Miller was acting as a purchaser on the one hand (vis-a-vis Carter & Hix) and as a seller on the other (vis-a-vis Dairyman's).

Second 3/12/10 Miller-Dairyman's Agreements constituted a fixed delivery date or simply a

"suggestion" or "goal" date. (*See, e.g.*, Docket No. 53 at p. 8.) Under the UCC:

> (1) Terms with respect to which the confirmatory records of the parties agree
> or which are otherwise set forth in a record intended by the parties as a
> final expression of their agreement with respect to such terms as are
> included therein *may not be contradicted* by evidence of any prior
> agreement or of a contemporaneous oral agreement but may be
> *supplemented* by evidence of:
>
>> (a) . . . course of dealing . . . ;
>>
>> . . .
>
> (2) Terms in a record may be explained by evidence of . . . course of
> dealing . . . without a preliminary determination by the court that
> the language used is ambiguous.

Tenn. Code Ann. § 47-2-202 (emphases added).

A "course of dealing" is a sequence of conduct concerning previous transactions between

the parties to a particular transaction that is fairly to regarded as establishing a common basis of

understanding for interpreting their expressions and other conduct." *Id.* § 47-1-303(b). A

"course of dealing between the parties . . . is relevant in ascertaining the meaning of the parties'

agreement, may give particular meaning to specific terms of the agreement, and may supplement

or qualify the terms of the agreement." *Id.* § 47-1-303(d). Furthermore:

> Except as otherwise provided in subsection (f),[20] the express terms of an
> agreement and any applicable course of performance, course of dealing, or usage
> of trade must be construed whenever reasonable as consistent with each other. If
> such a construction is unreasonable:
>
>> (1) express terms prevail over course of performance, course of
>> dealing, and usage of trade;

---

[20]Under subsection (f), "a course of performance is relevant to show a waiver or
modification of any term inconsistent with the course of performance." *Id.* § 47-1-303(f).

(*Id.* § 47-1-303(e).)

Here, the First and Second 3/12/10 Miller-Dairyman's Contracts unambiguously state that the loads subject to that agreement "are to be picked up by April 1, 2010." Dairyman's argues that the parties' conduct with respect to the 2/10/10 and 2/18/10 contracts, in which Miller permitted Dairyman's to pick up several loads after March 15 and March 22, 2010, respectively, constituted a "course of dealing" under which the target dates for delivery were merely "suggested" or "goal" dates. This argument fails for several reasons. First, the court finds that Dairyman's reading of the contract, which would essentially add the phrase "or thereafter" to the delivery date clause, is inconsistent with the plain language of the contract. That is, the interpretation would contradict – not qualify or supplement – that contractual term.[21] Thus, that interpretation would be unreasonable, and the express terms of the agreements control over course of dealing. *See id.* § 47-1-303(e)(1). Second, when Dairyman's and Miller entered into the First and Second 3/12/10 Contracts, the deadlines for Dairyman's to pick up the loads subject to the 2/10/10 and 2/18/10 Miller-Dairyman's Contracts had not yet expired. Therefore, by that date, there could not have been a "course of dealing" to permit late pickups in the first place. Third, even if the timing of the late pickups were relevant to interpreting the First and Second 3/12/10 Miller-Dairyman's Contracts, the court would not construe Miller's forbearance in permitting a handful of late pickups on the two previous agreements as establishing a "course of

---

[21]Indeed, unlike the first two agreements, which were somewhat ambiguous as to the final delivery/pickup date, the First and Second 3/12/10 Miller-Dairyman's Contracts provide a *specific* delivery date of April 1, 2010, further reflecting the parties' express intent to fix a hard deadline. According to Miller, he asked Dairyman's to agree to a fixed delivery date because Carter & Hix were demanding a fixed date for delivery as a precondition for selling the lumber to him in the first place.

dealing" that overrides the plain and unambiguous contractual terms. Accordingly, the court finds that the First and Second 3/12/10 Miller-Dairyman's Contracts established a final delivery/pickup date of April 1, 2010.

### C. Effect of the Verbal Amendments

#### 1. Parties' Disputes

Carter & Hix argue that, even assuming Miller's version of events, their alleged verbal agreement to extend the delivery period past April 1, 2010 – relative to their agreement with Miller – is *not* enforceable under the Statute of Frauds. For its part, Dairyman's argues that, because Miller has testified and readily admits that he (Miller) in fact told Dairyman's that the delivery date had been extended, that verbal agreement by Miller to extend Dairyman's pickup date *is* enforceable under the Statute of Frauds as between it and Miller.

The parties also dispute whether the doctrine of anticipatory repudiation applies here. There is a genuine factual dispute as to whether, on or before April 1, 2010, it became physically and/or practically impossible to complete pickups of the remaining 28 loads. Miller appears to believe that, had Dairyman's utilized its own fleet of trucks and/or utilized several trucking companies that Miller had recommended, the pickups could have been completed before the end of the day on April 1, 2010. By contrast, Carter & Hix appear to contend that, at least by April 1, 2010, and likely as of several days before that date, it was impossible to complete the pickups.

#### 2. Applicable UCC Provisions

With respect to the modification, rescission, or waiver of contractual provisions, the UCC provides as follows:

(1)     An agreement modifying a contract within this chapter needs no consideration to be binding.

. . .

(3)    The requirements of the statute of frauds section of this chapter (§ 47-2-201) must be satisfied if the contract is modified within its provisions.

(4)    *Although an attempt at modification or rescission does not satisfy the requirements of subsection (2) or (3) it can operate as a waiver.*

(5)    A party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver.

§ 42-2-610 (emphasis added.)

With respect to anticipatory repudiation, the UCC provides as follows:

When a party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may:

(a)    for a commercially reasonable time await performance by the repudiating party;

(b)    resort to any remedy for breach (§ 47-2-703 or § 47-2-711), even though he has notified the repudiating party that he would await the latter's performance and has urged retraction; and

(c)    in either case suspend his own performance or proceed in accordance with the provisions of this chapter on the seller's right to identify goods to the contract notwithstanding breach or to salvage unfinished goods (§ 47-2-704).

*Id.* § 47-2-610.

3.    <u>Application of the UCC Provisions</u>[22]

(a)    Application to Miller-Dairyman's Agreements

---

[22]The parties' briefing regarding the application of these provisions is not a model of clarity. The court's resolution herein of certain disputed questions should assist the parties in focusing the issues remaining for trial.

With respect to the contracts between Miller and Dairyman's, Miller admits that he represented to Dairyman's on April 1, 2010 that Dairyman's would have additional time to complete pickups, notwithstanding the contractual deadline of April 1, 2010. Section 47-2-209(c) provides that, if the Statute of Frauds is satisfied (*i.e.*, § 47-2-201), a modification is enforceable. Here, Miller has testified that he granted an extension to Dairyman's to complete pickups and Dairyman's seeks to enforce that promise against Miller, thereby satisfying subsection (3) of the UCC the Statute of Frauds (§ 47-2-201(3)). Therefore, the modification meets the requirements of UCC § 47-2-209(c). Although there was no consideration for this modification, consideration was not required. *Id.* § 47-2-209(a). Thus, assuming that Dairyman's had not already breached the agreement, Miller's agreement to extend the contractual deadline is enforceable against him.[23]

The issue of anticipatory repudiation does not appear to be material to Dairyman's counter-claims against Miller. Even if Dairyman's in fact repudiated the contract on or after April 1, 2010, Miller did not choose to exercise his contractual right under UCC § 47-2-610(b) to

---

[23]Even if Miller's promise did not satisfy the Statute of Frauds, it would have operated as a waiver pursuant to UCC § 47-2-209(4). "A waiver is a voluntary relinquishment of some right, a foregoing or giving up of some benefit or advantage, which, but for such waiver, he would have enjoyed. It may be proved by express declaration; or by acts and declarations manifesting an intent and purpose not to claim the supposed advantage; or by a course of acts and conduct, or by so neglecting and failing to act, as to induce belief that it was his intention and purpose to waive." *Gold Kist, Inc. v. Pillow*, 582 S.W.2d 77, 79 (Tenn. Ct. App. 1979) (quoting *Baird v. Fidelity-Phenix Fire Ins. Co.*, 162 S.W.2d 384 (Tenn. 1942)). Thus, "parol evidence is admissible to show a waiver of a contractual provision." *Gold Kist*, 582 S.W.2d at 79 (parol evidence demonstrated waiver, where seller had alleged that buyer had waived buyer's right to strict order of delivery of soybean shipments); *see also Estep v. Monticello Canning Co., Inc.*, App. No. 87-297-II ,1988 WL 22842, *4 (Tenn. Ct. App. Mar. 9, 1988) (finding that defendant plant seller's alleged oral representation constituted an impermissible oral "modification" rather than a "waiver," because the oral representation would have enlarged the agreed quantity of the sale). In making his representation to Dairyman's, Miller effectively waived his right to demand pickups by April 1, 2010.

"resort to any remedy for breach." Instead, he chose to (a) modify or waive the contractual term concerning the April 1, 2010 pickup date, thereby affording Dairyman's a "reasonable time" to complete performance (*see id.* § 47-2-309) and/or (b) grant to Dairyman's a "commercially reasonable" amount of time to complete performance, pursuant to § 47-2-610. In either case, Miller broke that promise: on April 14, 2010, the first date on which Dairyman's was permitted to complete the pickups, Dairyman's was unable to access the warehouse and Miller was forced to renege on his promised extension.

Thus, Dairyman's is entitled to summary judgment on the liability portion of its breach of contract claims against Miller.

(b)     Application to Miller-Carter & Hix Agreements

The alleged verbal modification to the agreements between Miller and Carter & Hix presents a different set of circumstances. Here, Miller seeks to enforce an alleged verbal promise by Carter & Hix against them. However, Carter & Hix specifically deny that they granted Miller an extension of the April 1, 2010 delivery date. Therefore, subsection (3) of the UCC Statute of Frauds, which provides an exception to the writing requirement only when the party against whom enforcement is sought (here, Carter & Hix) admits through testimony or otherwise that it actually made the promise, is not satisfied.

Although Carter & Hix rest on that argument alone, it does not end the inquiry. As noted above, a proposed modification that does not satisfy the Statute of Frauds may nevertheless operate as a *waiver* of a contractual term. *Id.* § 47-2-209(4); *see Gold Kist*, 582 S.W.2d at 89-90; *U.S. for Use & Benefit of Shankle-Clairday, Inc. v. Crow*, 414 F. Supp. 160, 165 (M.D. Tenn. 1976) (defendant's acquiescence in repeated delays of performance by plaintiff and choice not to

terminate contract for nonperformance thereby waived performance date pursuant to § 47-2-209).

That waiver is effective, unless the party making the waiver provides "reasonable notification to

the other party that strict performance is required, *unless the retraction would be unjust in view of*

*a material change in position in reliance on the waiver*." *Id.* § 47-2-209(5) (emphasis added).

Here, according to Miller, Carter & Hix waived their right to demand specific

performance by April 1, 2010, choosing to grant a reasonable extension to Miller to complete the

pickups. Carter & Hix argue that they never waived this term. Thus, there is at least a question

of fact as to whether, pursuant to UCC § 47-2-209(4), Carter & Hix granted Miller a waiver of

the delivery date term. If so, the extension implicitly would include at least a reasonable amount

of time to complete performance.

Assuming that Carter & Hix in fact waived the April 1, 2010 delivery term, the next

question is whether they complied with the "reasonable notification" requirement of § 47-2-

209(5). The key question is whether, when Carter & Hix retroactively demanded strict

performance of the contractual terms – which was by then impossible – Miller had taken any

actions or refrained from taking any actions in reliance on the waiver. There is a question of fact

on this point for at least three reasons. First, on April 1, 2010, the date on which Miller claims he

received the requested extension, he ceased any efforts to arrange pickups (directly or indirectly)

to occur that day, which presumably would at least have reduced the number of outstanding loads

by the close of business. Second, based on his understanding that an extension had been granted,

Miller did not declare that Dairyman's had breached any of the Miller-Dairyman's Contracts and,

accordingly, did not pursue any of his contractual remedies for breach. Instead, believing that he

himself had more time to complete performance with respect to Carter & Hix, Miller granted

Dairyman's an extension of time to perform its obligations under the Miller-Dairyman's

25

contracts. Taking the facts in the light most favorable to Miller, in reliance of Carter & Hix's representations, Miller took these actions or refrained from acting to his detriment: Miller is now liable for breach of contract to Dairyman's, whereas Dairyman's may have been liable to *him* on April 2, 2010.[24] Third, between April 1, 2010 and April 14, 2010, had Miller understood that he had breached his agreements with Carter & Hix, he could have taken actions to mitigate the damages from that breach. For example, had Miller sought to procure replacement lumber on April 2 to honor his agreements with Dairyman's, the cost for that replacement lumber might have been lower than what was available several weeks later, when Dairyman's customers sought to cover.

As to the doctrine of anticipatory repudiation, the consequences of Miller's breach appear to turn on (a) whether Carter & Hix in fact granted Miller an enforceable extension; and, if so, (b) whether, on or before April 1, 2010, Miller anticipatorily repudiated his agreements with Carter & Hix to complete pickups by that date. Under Miller's version of the facts, Carter & Hix elected either to (a) waive the delivery term and provide reasonable time to complete performance (*see id.* § 47-2-309); or (b) provide a commercially reasonable time to complete performance (*see id.* § 47-2-610). Under Carter & Hix's version of the facts, they did not waive the delivery term and elected to suspend performance (*i.e.*, to deny access to the loads at the warehouse), which is a permissible remedy under the UCC. These considerations implicate multiple disputed material facts that will be for the jury to decide..

## II.    The Parties' Non-UCC Claims

---

[24]Although Miller has not directly articulated this theory of detrimental reliance, this theory flows logically from the court's findings that, with respect to Dairyman's, Miller modified (or waived) the delivery term and breached that promise.

## A.    Miller's Common Law Breach of Contract Claim Against Dairyman's

Miller argues that he is entitled to summary judgment on his breach of contract claim against Dairyman's with respect to the McMinville Transactions.  Dairyman's does not dispute that, absent the damages it suffered from the Lafayette Transactions, it would be liable to Miller for the outstanding balance on the McMinville Transactions.  However, Dairyman's asserts that it is entitled to offset the value of those loads against the losses it incurred in the Lafayette Transactions due to Miller's breach of their agreements.  Miller does not contest that, if he owes money to Dairyman's on the Lafayette Transactions, Dairyman's could offset that amount against the McMinville Transactions.  *See Continental Bankers Life Ins. Co. of the South v. Bank of Alamo*, 578 S.W.2d 625, 631 (Tenn. 1979).

Given the court's finding that Miller is liable to Dairyman's for breach of contract with respect to the Lafayette Transactions, Dairyman's is entitled to offset its losses in those transactions against the contract price in the McMinville Transaction.  However, Miller has changed the reliability and reasonableness of Dairyman's damages calculations, creating a dispute regarding the appropriate measure of Dairyman's offset that the court cannot and need not resolve at this stage.[25]

## B.    Dairyman's TCPA Counter-Claim Against Miller

The TCPA forbids unfair or deceptive acts or practices affecting the conduct of any trade

---

[25]Depending on the jury's factual findings, Carter & Hix also have an interest in probing the appropriate measure of Dairyman's damages.  Miller and Dairyman's have suggested that a damages hearing would resolve this dispute, a point on which Carter & Hix have not taken a position.  Also, depending on the jury's findings, the court may require further briefing (or a stipulation) from the parties regarding the appropriate basis for a prejudgment interest calculation, particularly if the appropriate offset on the McMinville Transactions turns out to be less than what was actually withheld (*i.e.*, that Dairyman's withheld too much money from Miller).

or commerce.  Tenn. Code Ann. § 47-18-104(a) (2012).  Although asserted in Dairyman's counter-claims, the parties have essentially ignored this claim in their briefing.[26]

The court finds that dismissal of the TCPA is appropriate.  First, in the face of Miller's request that Dairyman's claims be dismissed, the court regards Dairyman's failure to address the TCPA as implicit abandonment of that claim, thereby justifying dismissal on that basis alone. *See Gibson-Homes v. Fifth Third Bank*, 661 F. Supp. 2d 905, 912 (M.D. Tenn. 2009); *Perry v. Hoeganaes Corp*, No. 3:04-cv-0525, 2005 WL 1875090, at *6 (M.D. Tenn. Aug. 5, 2005). Second, even if the claim were not abandoned, Dairyman's has not identified evidence establishing a TCPA claim against Miller, including any "unfair" or "deceptive" practices by Miller.[27]  As between Miller and Dairyman's, this case is essentially a breach of contract dispute, for which the associated remedies will provide complete relief.

### C.    Miller's Third-Party Claims Against Carter & Hix

In addition to his breach of contract claim against Carter & Hix, Miller asserts claims for promissory estoppel, equitable estoppel, and breach of implied contract against them.

#### 1.    Promissory Estoppel

"Promissory estoppel is based on 'a promise which the promisor should reasonably

---

[26]In his Motion for Summary Judgment, Miller demands dismissal of Dairyman's claims but he does not reference the TCPA claim specifically, nor does Dairyman's address the TCPA claim in its Response.  Similarly, in Dairyman's Motion for Summary Judgment, in which Dairyman's requests judgment in its favor, Dairyman's does not reference the TCPA claim, nor does Miller address the claim in his Response thereto.

[27]To recover under the TCPA, the claimant must prove: (1) that the other party engaged in an unfair or deceptive act or practice declared unlawful by the TCPA; and (2) the other party suffered an ascertainable loss of money or property . . . ." *Id.* § 47-18-109(a)(1); *Tucker v. Sierra Builders*, 180 S.W.3d 109, 115 (Tenn. Ct. App. 2005).  Because the TCPA does not define the terms "unfair" or "deceptive", the standards to be used in determining whether a representation is "unfair" or "deceptive" under the TCPA are legal matters to be decided by the courts.  *Id.* at 116.

expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance [, which] is binding if injustice can be avoided only be enforcement of the promise." *Barnes & Robinson Co., Inc. v. OneSource Facility Servs., Inc.*, 195 S.W.3d 637, 645 (Tenn. Ct. App. 2006) (quoting *Calabro v. Calabro*, 15 S.W.3d 873, 878 (Tenn. Ct. App. 1999)). "The limits of promissory estoppel are: (1) the detriment suffered in reliance must be substantial in an economic sense; (2) the substantial loss to the promisee in acting in reliance must have been foreseeable by the promisor; and (3) the promisee must have acted reasonable [sic] in justifiable reliance on the promise as made. *Barnes & Robinson*, 195 S.W.3d at 645 (quoting *Calabro*, 15 S.W.3d at 879) (emphasis omitted). The promise must be unambiguous and not unenforceably vague. *Amacher v. Brown-Forman Corp.*, 826 S.W.2d 480, 482 (Tenn. Ct. App. 1991); *Chavez v. Broadway Elec. Serv. Corp.*, 245 S.W.3d 398, 404 (Tenn. Ct. App. 2007). A plaintiff may invoke the doctrine of promissory estoppel, even where a contract for the sale of goods would ordinarily be governed by Article 2 of the UCC. *Amacher*, 826 S.W.2d at 482.

"Tennessee does not liberally apply the doctrine of promissory estoppel." *Barnes & Robinson*, 195 S.W.3d at 645. Promissory estoppel is limited to "exceptional cases where to enforce the statute of frauds would make it an instrument of hardship and oppression, verging on actual fraud." *Shedd v. Gaylord Entm't Co.*, 118 S.W.3d 695, 699-700 (Tenn. Ct. App. 2003) (quoting *Baliles v. Cities Serv. Co.*, 578 S.W.2d 621 (Tenn. 1979)); *Chavez*, 245 S.W.3d at 406-407.[28]

---

[28]In *Carbon Processing & Reclamation, LLC v. Valero Mktg. & Supply Co.*, 823 F. Supp. 2d 786, 819-24 (W.D. Tenn. 2011), a federal district court certified two questions to the Tennessee Supreme Court concerning application of the promissory estoppel doctrine in the context of a dispute governed by the UCC. Based on an interim finding by the federal district

The court finds that there is a genuine dispute of material fact as to whether Miller may prevail on his promissory estoppel claim. A jury could reasonably find as follows: Carter & Hix promised him an extension of time to perform; Miller reasonably relied on that promise to his detriment in one or more respects, as discussed above at pp. 25-26; Carter & Hix were sufficiently aware that Miller would do so; Carter & Hix reneged on their promise, notwithstanding their appreciation of the predicament in which it placed Miller relative to his customer (*i.e.* Dairyman's); and Carter & Hix retracted the promise to permit them to sell the loads to other parties, thereby taking advantage of rising market prices. Furthermore, although the alleged promise from Carter & Hix may not have included a specific end date, a jury could find that the promise incorporated at least a reasonable amount of time after April 14, 2010 to complete the lumber pickups. Thus, viewing the facts in the light most favorable to Miller, enforcing the statute of frauds (if otherwise satisfied) could amount to "an instrument of hardship and oppression" that the promissory estoppel doctrine is designed to protect. *See Shedd*, 118 S.W.3d at 700.[29]

2. <u>Equitable Estoppel</u>

Equitable estoppel provides a narrow exception to the statute of frauds. *See Nationsbank, N.A. (South) v. Millington Homes Inv., Ltd.*, No. 02A01-9805-CH-00134, 1999 WL 79204, at *3

---

court that mooted the promissory estoppel claim, the Tennessee Supreme Court denied the certification as moot. *See Carbon Processing & Reclamation, LLC, et al. v. Valero Mktg & Supply Co.*, No. M2011-02571-SC-R23-CQ (Tenn. Feb. 23, 2001). At any rate, here, Carter & Hix do not dispute that Miller may invoke the promissory estoppel doctrine (although Carter & Hix argue that he has not satisfied its elements), while Miller cites to no legal authority demonstrating that the *Shedd/Baliles* standard does not apply to the promissory estoppel claim in the context presented here, where the UCC Statute of Frauds has been raised as a defense.

[29]Proof concerning the promissory estoppel claim will largely be established (or not) through adjudication of the contract-based claims, in any case.

(Tenn. Ct. App. Feb. 19, 1999).  Like the promissory estoppel doctrine, it is recognized in cases

"where to enforce the Statute of Frauds would make it an instrument of hardship and oppression,

verging on actual fraud." *Id.* (quoting *Baliles*, 578 S.W.2d at 624).  The doctrine requires the

following showing concerning the party against whom enforcement is sought:

> (1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert;
>
> (2) Intention, or at least expectation[,] that such conduct shall be acted upon by the other party; and
>
> (3) Knowledge, actual or constructive[,] of the real facts.

*Id.*  Equitable estoppel also requires the following showing concerning the party claiming

the estoppel:

> (1) Lack of knowledge and of the means of knowledge of the truth as to the facts in question;
>
> (2) Reliance upon the conduct of the party estopped; and
>
> (3) Action based thereon of such character as to change his position prejudicially.

*Id.*  As stated by the Tennessee Supreme Court in *Baliles*:

> Equitable estoppel in the modern sense, arises from the "conduct" of the party, using that word in its broadest meaning, as including his spoken or written words, his positive acts and his silence or negative omission to do any thing.  Its foundation is justice and good conscience.  Its object is to prevent the unconscientious and inequitable assertion or enforcement of claims or rights which might have existed, or have been enforceable by other rules of law, unless prevented by estoppel, and its practical effect is, from motives of equity and fair dealing, to create and vest opposing rights in the party who obtains the benefit of the estoppel.

578 S.W.2d at 624 (quoting *Evans v. Belmont Land Co.*, 21 SW. 670, 673-74 (Tenn. 1893)).

As with application of the promissory estoppel claim, the court finds that, although it is a close question, there are genuine disputes of material fact that preclude summary judgment on the equitable estoppel claim, including, *inter alia*, whether Carter & Hix promised an extension in the first place and, if so, what their intentions were and how they reasonably should have expected Miller to act or refrain from acting in reliance on their promise.

3. <u>Unjust Enrichment</u>

The elements of an unjust enrichment claim are: (1) a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of such benefit; and (3) acceptance of such benefit under such circumstances that it would be inequitable for him or her to retain the benefit without payment of the value thereof. *United States v. Goforth*, 465 F.3d 730, 733-34 (6th Cir. 2006) (citing *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005)). "Under Tennessee law, to establish an unjust enrichment claim, a plaintiff must have conferred a benefit upon the defendant." *Id.* at 734 (quoting *Perry v. The Am. Tobacco Co, Inc.*, 324 F.3d 845, 851 (6th Cir. 2003)). "A benefit is any form of advantage of being saved from an expense or loss." *Freeman*, 172 S.W.3d at 525. "A plaintiff may recover for unjust enrichment against a defendant who receives *any* benefit from the plaintiff if the defendant's retention of the benefit would be unjust." *Id.* (emphasis in original).

Here, Miller has not demonstrated that he conferred any benefit on Carter & Hix that would serve as a predicate for an unjust enrichment claim. Indeed, Miller received payment in full for all loads that were actually picked up by April 1, 2010. Accordingly, summary judgment is appropriate on Miller's unjust enrichment claim.

**D.    Miller's Third-Party Claims Against Randy Driver**

Neither Miller nor any other party has addressed Miller's joint venture claim against

Driver.  Therefore, Miller's claim against Driver will remain for trial.

## CONCLUSION

 For the reasons stated herein, the court concludes as follows:

- Dairyman's Motion for Summary Judgment (Docket No. 52) will be granted in part and denied in part.  Dairyman's is entitled to summary judgment on the liability portion of its claims for breach of contract with respect to the Lafayette Transactions.  Dairyman's TCPA claim will be dismissed.  At the pretrial conference, the parties shall be prepared to address the appropriate means for resolving disputed questions concerning the appropriate value of Dairyman's offset.

- Dairyman's request to strike Carter & Hix's Response to Dairyman's Motion for Summary Judgment (Docket No. 82, pp. 2-4) will be denied.

- Carter & Hix's Motion for Summary Judgment (Docket No. 74) will be granted in part and denied in part.  Miller's third-party claim against Carter & Hix for unjust enrichment will be dismissed with prejudice.  Miller's third-party claims against Carter & Hix for breach of contract, promissory estoppel, and equitable estoppel will remain for trial.

- Miller's Motion for Summary Judgment against Dairyman's (Docket No. 77) will be granted in part and denied in part.  Dairyman's TCPA claim will be dismissed with prejudice.  Miller's request for summary judgment on his breach of contract claim against Dairyman's will be denied, but Miller will be without prejudice to demand judgment to the extent Dairyman's claimed offset exceeded Miller's appropriate liability to Dairyman's, once that appropriate amount is determined.

- Miller's third-party claim against Driver will remain for trial.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

33